PUBLIC VERSION

███████████████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| FINTIV, INC., | |
|      Plaintiff, | |
| v. | Civil Action No. 1:19-cv-01238-ADA |
| APPLE INC., | |
|      Defendant. | |

## DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

PUBLIC VERSION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF UNDISPUTED FACTS .......................................................... 2

III.    LEGAL STANDARDS ........................................................................................ 3

IV.     APPLE DOES NOT INFRINGE CLAIM 18 WHEN FOREIGN USERS
        PROVISION CARDS FROM OUTSIDE THE UNITED STATES. ................................... 4

        A.      There Is No Infringement Under § 271(a) When The "Situs Of
                Infringement" Is Outside The United States. ............................................ 5

        B.      Foreign Users "Exercise Control" Of The Accused Card Provisioning
                System From Outside The United States. ................................................. 7

        C.      For Foreign Users, Beneficial Use Of the System Is Obtained Outside The
                United States. .......................................................................................... 10

V.      APPLE DOES NOT INFRINGE THE ASSERTED CLAIMS BECAUSE
        FINTIV HAS NO EVIDENCE OF A "WIDGET" IN THE ACCUSED
        PRODUCTS ......................................................................................................... 12

        A.      Fintiv And Its Expert Failed To Identify The Claimed "Widget" In The
                Accused Products .................................................................................... 14

        B.      Apple's Engineers And Experts Uniformly Confirmed That Apple Does
                Not Use The Claimed "Widget." ............................................................ 17

        C.      The Court Should Disregard The New "Widget" Theories Dr. Shamos
                Offered At His Deposition, But Those New Theories Do Not Change The
                Result Of This Motion. ........................................................................... 18

VI.     THE ACCUSED IPADS AND MACS DO NOT MEET THE "CONTACTLESS"
        LIMITATION OF CLAIMS 11 AND 23. ............................................................ 20

        A.      The Court's Claim Construction Confirms That "Contactless" Does Not
                Mean "Wireless." ................................................................................... 22

        B.      The Accused iPads And Macs Do Not Contain A "Contactless" Card
                Applet And Therefore Do Not Infringe Claims 11 And 23. ................... 22

VII.    THE ACCUSED IPHONE-WATCH PAIRING IS NOT A "MOBILE DEVICE"
        UNDER THE COURT'S CONSTRUCTION. ...................................................... 24

        A.      The Asserted Claims Require "A Single Mobile Device." ..................... 24

        B.      The Pairing Of An iPhone And An Apple Watch Cannot Constitute "A
                Single Mobile Device." ........................................................................... 25

VIII.   CONCLUSION ................................................................................................... 26

i

PUBLIC VERSION

████████████

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
   324 F. Supp. 3d 470 (D. Del. 2018).....................................................................................10

*Alice Corp. Pty. Ltd*,
   667 F. Supp. 2d 29, 35-36 (D.D.C. 2009)..........................................................................8, 10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................................3, 4

*Blue Spike, LLC v. Soundmouse Ltd.*,
   No. 14-cv-2243, 2014 WL 6851259 (S.D.N.Y. Dec. 2, 2014)...........................................8, 10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................................3, 4

*Centillion Data Sys., LLC v. Qwest Comms. Int'l, Inc.*,
   631 F.3d 1279 (Fed. Cir. 2011)........................................................................................ passim

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
   526 U.S. 795 (1999)..............................................................................................................17

*Eason v. Thaler*,
   73 F.3d 1322 (5th Cir. 1996) .................................................................................................3

*Forsyth v. Barr*,
   19 F.3d 1527 (5th Cir. 1994) .................................................................................................3

*Grecia v. McDonald's Corp.*,
   724 F. App'x 942 (Fed. Cir. 2018) ..................................................................................10, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................................3

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005)..............................................................................................3

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)....................................................................................... passim

*Pellegrini v. Analog Devices, Inc.*,
   375 F.3d 1113 (Fed. Cir. 2004)..............................................................................................5

PUBLIC VERSION

██████████████

## TABLE OF AUTHORITIES
### (Cont.)

**Page(s)**

*Ragas v. Tenn. Gas Pipeline Co.*,
  136 F.3d 455 (5th Cir. 1998) ................................................................................3, 4

*Renhcol Inc. v. Don Best Sports*,
  548 F. Supp. 2d 356 (E.D. Tex. 2008) ....................................................................11

**STATUTES**

35 U.S.C. § 271(a) .................................................................................................. passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ....................................................................................................3

WEST\294918330.1

PUBLIC VERSION
████████████████

## I.      INTRODUCTION

Apple moves for summary judgment of noninfringement on four independent and equally

compelling grounds.

First, Apple seeks summary judgment of noninfringement as to Fintiv's claim that

foreign users who provision cards using Apple Pay infringe the wallet management system

recited in independent claim 18.  As a matter of law, these foreign users do not "use" the accused

system "within the United States," so their allegedly infringing activities are beyond the

territorial scope of 35 U.S.C. § 271(a).  Granting summary judgment on this ground will remove

████████████████ of damages based on "foreign provisions" from Fintiv's ████████████

damages demand.

Second, Apple requests summary judgment of noninfringement as to all asserted claims

(claims 11, 13, 14, 18, 20, 23, 24, and 25) because Fintiv and its technical expert, Dr. Michael

Shamos, failed to identify any software code in the accused products that constitutes a "widget"

under the Court's construction of that term, which is a requirement of all asserted claims.  The

undisputed evidence demonstrates the Apple accused products do not use a "widget" as

construed, and granting summary judgment on this ground will be case dispositive.

Third, Apple seeks summary judgment that the accused iPads and Macs do not infringe

asserted claims 11 and 23 and their dependent claims, because the accused iPads and Macs do

not meet the "contactless card applet" limitations of those claims.  As construed by the Court,

"contactless" transactions are not equivalent to "wireless" transactions, but for iPads and Macs,

Fintiv and its expert point to purely wireless transactions.  Granting summary judgment on this

ground will remove the accused iPads and Macs from this case.

Fourth, Apple requests summary judgment that the pairing of an iPhone and an Apple

Watch does not satisfy the Court's construction of "mobile device" as "a single mobile device."

1

The iPhone and Watch are two different "mobile devices," and Fintiv's allegations with respect to the iPhone-Watch pairing are flatly contrary to the Court's construction of that term.  Granting summary judgment on this ground will remove the accused Apple Watches from this case.

For the reasons demonstrated below, summary judgment of noninfringement is warranted on all four grounds.

## II.    STATEMENT OF UNDISPUTED FACTS

On December 21, 2018, Fintiv filed its complaint alleging infringement of U.S. Patent No. 8,843,125 ("the '125 patent").  ECF No. 1, ¶ 3.  Fintiv alleges Apple infringes independent claims 11, 18, and 23 and dependent claims 13, 14, 20, 24, and 25 (the "asserted claims").  Ex. 2, Shamos Report ¶ 2.

All the asserted claims relate to "card provisioning."  Ex. 3, Shamos Depo. at 31:21-24; Ex. 1, '125 patent, claims 11, 18, 23.  Card provisioning is a process whereby a user "load[s] data concerning a payment instrument, such as a credit card, onto a mobile device for the purposes of making payment transactions."  Ex. 2, Shamos Report ¶ 71.  Independent claim 11 recites a method for card provisioning, specifically a "method for provisioning a contactless card applet in a mobile device comprising a mobile wallet application."  Independent claim 18 recites a system for card provisioning, specifically a "wallet management system (WMS) in a non-transitory storage medium to store and manage mobile wallet account information."  Independent claim 23 recites a "mobile device" for card provisioning.  Ex. 1, '125 patent, claims 11, 18, 23.

Fintiv accuses each of the Apple iPhone, Watch, iPad, and Mac products of infringing at least one claim of the '125 patent.  Ex. 2, Shamos Report ¶ 102-03.  The accused iPads and Macs do not have an near-field communication ("NFC") antenna and, therefore, cannot conduct NFC transactions.  *See* Ex. 3, Shamos Depo. at 141:22-142:2; Ex. 2, Shamos Report ¶ 88 (NFC signals in payment transactions "travel only inches and are secure because they are both short-

PUBLIC VERSION

distance and encrypted"). Fintiv's accusations against iPads and Macs are limited to conducting

in-app or online purchase transactions through Apple Pay. Ex. 2, Shamos Report ¶¶ 45, 88, 269-

270, 279. Apple Pay provides users with the capability to perform mobile payments securely

and requires that users add or provision a card to their digital wallet. Ex. 4, Weinstein Report ¶

63. Fintiv accuses Apple of infringement of claim 18 of the '125 patent when users outside the

United States provision cards in connection with Apple Pay—what Fintiv calls "foreign

provisions." Ex. 4, Weinstein Report, Ex. 20.1.

## III.    LEGAL STANDARDS

Summary judgment is warranted when "there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.,* 136

F.3d 455, 458 (5th Cir. 1998). An issue of material fact is genuine only if the evidence could

lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248 (1986). In determining whether a genuine issue for trial exists, the court views all

inferences drawn from the factual record in the light most favorable to the nonmoving party. *Id.;*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party makes a *prima facie* showing that it is entitled to summary

judgment, the nonmoving party must assert competent summary judgment evidence showing the

existence of a genuine fact issue for trial. *See Matsushita*, 475 U.S. at 586; *MEMC Elec.*

*Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1373 (Fed. Cir. 2005)

(citing *Anderson*, 477 U.S. at 248). Mere conclusory allegations, unsubstantiated assertions,

improbable inferences, and unsupported speculation are not competent summary judgment

evidence. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d

1527, 1533 (5th Cir. 1994). The nonmoving party is required to identify evidence in the record

PUBLIC VERSION

█████████████████████████████

and articulate the manner in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.

"Only disputes over facts that might affect the outcome of the suit under the governing laws will

properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  Summary

judgment must be granted if the nonmoving party fails to make a showing sufficient to establish

the existence of an element essential to its case and on which it will bear the burden of proof at

trial.  *Celotex*, 477 U.S. at 322-23.

## IV.   APPLE DOES NOT INFRINGE CLAIM 18 WHEN FOREIGN USERS PROVISION CARDS FROM OUTSIDE THE UNITED STATES.

The Court should enter summary judgment of noninfringement of claim 18 for what

Fintiv calls "foreign provisions"—that is, users located in foreign countries who provision cards

using Apple Pay on devices outside the United States (hereafter "Foreign Users").  Fintiv's

damages expert, Roy Weinstein, improperly includes ███████████████ in damages solely

from these so-called "foreign provisions."  Ex. 4, Weinstein Report, Ex. 20.1.  Because Fintiv

improperly tries to bring foreign transactions into this domestic dispute, the Court should grant

summary judgment on this issue.

Fintiv's "foreign provisions" direct and indirect infringement theory for claim 18 is based

on a faulty premise—that Foreign Users "use" the accused card provisioning system "within the

United States" merely because their foreign devices may communicate with Apple servers in the

United States.  Ex. 2, Shamos Report ¶ 504 ("███████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████); *see also id.* ¶ 505-06 (Dr. Shamos' "foreign provisions" infringement theory for

PUBLIC VERSION
███████████████████

induced and contributory infringement, respectively).[1]  But Federal Circuit authority and
undisputed facts prohibit Fintiv's theory.  Foreign Users do not use the accused system "within
the United States" as required under § 271(a).  Rather, the "situs of infringement"—that is, "the
place where control of the system is exercised and beneficial use of the system obtained"—is
outside the United States.  *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316-17
(Fed. Cir. 2005).  Claim 18 recites a "mobile device" that, under Fintiv's "foreign provisions"
infringement theory, is located <u>outside</u> the United States.  Foreign Users initiate the accused card
provisioning system by using their mobile devices from their foreign locations, thus causing the
system to "act for its intended purpose."  *Centillion Data Sys., LLC v. Qwest Comms. Int'l, Inc.*,
631 F.3d 1279, 1285 (Fed. Cir. 2011); *see also* Ex. 3, Shamos Depo. at 19:1-21:23.  Foreign
Users also obtain beneficial use of the card provisioning system—what Dr. Shamos calls ██████
████████████████████████████████████████████████  (Ex. 2, Shamos
Report ¶ 123)—in their foreign locations using their foreign devices.  Therefore, Foreign Users'
use of the accused Apple Pay card provisioning system is beyond the territorial reach of § 271 as
a matter of law.

> **A.    There Is No Infringement Under § 271(a) When The "Situs Of Infringement"
> Is Outside The United States.**

"[As] the U.S. Supreme Court explained nearly 150 years ago in *Brown v. Duchesne*, …
the U.S. patent laws 'do not, and were not intended to, operate beyond the limits of the United
States.'"  *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1117 (Fed. Cir. 2004) (citation
omitted); *see also* 35 U.S.C. § 271(a) (patent infringement requires allegedly infringing acts

---

[1] Fintiv's indirect infringement allegations under the "foreign provisions" theory are based on
acts of direct infringement that arise under § 271(a), not § 271(f).

"within the United States").  This is because "Section 271(a) is only actionable against patent

infringement that occurs within the United States." *NTP*, 418 F.3d at 1313.  A plaintiff must

therefore demonstrate that the "situs of infringement"—the location of the allegedly infringing

acts—is within the United States.  *Id.* at 1316.  For Foreign Users, Fintiv cannot do so.

   In *NTP*, the Federal Circuit considered the situs of infringement for patents claiming "a

system for transmitting originated information" between processors in an electronic mail system.

*Id.* at 1294.  There, components of the accused system operated in different countries—RIM's

customers used their mobile devices in the United States, while RIM operated a "relay"

component of the wireless network in Canada.  *Id.* at 1311.  The Federal Circuit held that "use of

a claimed system under section 271(a) is the place at which the system as a whole is put into

service, *i.e.*, the place where control of the system is exercised and beneficial use of the system

obtained."  *Id.* at 1317.  Applying this analysis, the Federal Circuit held that RIM's customers

using mobile devices in the United States controlled and benefitted from the system and thus the

"situs of infringement" was in the United States:

> RIM's customers located within the United States controlled the
> transmission of the originated information and also benefited from
> such an exchange of information.  Thus, the location of the Relay
> in Canada did not, as a matter of law, preclude infringement of the
> asserted system claims in this case.

*Id*.  As demonstrated below, *NTP* controls this case, although opposite facts here compel the

opposite result.  Namely, it is undisputed Foreign Users of the accused system "control[] the

transmission of the originated information and also benefit[] from such an exchange of

information" <u>outside</u> the United States.  *Id*.  Thus, the location of Apple servers in the United

States does not change the analysis; rather, *NTP* compels a finding that the "use" by Foreign

Users occurs outside the United States and is therefore beyond the reach of § 271.  *Id.* at 1316.

**B.      Foreign Users "Exercise Control" Of The Accused Card Provisioning System From Outside The United States.**

Under the first factor of the *NTP* analysis, the "place where control of the system is exercised" for Foreign Users is outside the United States despite the presence of Apple servers in the United States.  Indeed, courts frequently hold that users exercise control over an accused system from a location different from the physical location of other system components.

For example, in *Centillion Data Systems., LLC v. Qwest Communications International, Inc.*, the asserted patent claimed a "system for collecting, processing, and delivering information from a service provider, such as a telephone company, to a customer."  631 F.3d 1279, 1281 (Fed. Cir. 2011).  The accused system included two parts: "'a back-end' system maintained by the service provider (claim elements 1, 2, and 3) and a 'front-end' system maintained by an end user (claim element 4)."  *Id.*  The district court ruled that Qwest's customers did not "use" the claimed system under § 271(a) because those customers did not direct or control the data processing of the back-end.  *Id.* at 1282.  The Federal Circuit reversed.  Relying on *NTP*, the Federal Circuit held that Qwest's customers in the United States "used" the accused system by "causing the system as a whole to perform this processing and obtaining the benefit of the result":

> The customer controls the system by creating a query and transmitting it to Qwest's back-end.  The customer controls the system on a one request/one response basis.  This query causes the back-end processing to act for its intended purpose to run a query and return a result … .  This is "use" because, but for the customer's actions, <u>the entire system would never have been put into service</u>.

*Id.* at 1285 (emphasis added).

Similarly, in *CLS Bank International v. Alice Corp. Pty. Ltd.,* none of the accused system components were located in the United States, yet the court held that users in the United States

"controlled" the system.  667 F. Supp. 2d 29, 35-36 (D.D.C. 2009).  Relying on *NTP*, the court

found that United States users (or "members") exercised control over the system because they

"control[ed] the input" via the "submission of transactions."  *Id.*  The court explained that

"settlement and pay-out occur only in response to the submission of transactions by CLS

Members, including U.S. members."  *Id.*  The members' input caused the system to act for its

intended purpose, resulting in "settlement and pay-out."  *Id.*

Likewise, in *Blue Spike, LLC v. Soundmouse Ltd.*, the accused system "provide[d] music

recognition services for its customers" using "digital fingerprints for music."  No. 14-cv-2243,

2014 WL 6851259, at *2 (S.D.N.Y. Dec. 2, 2014).  To identify a certain piece of musical

content, Soundmouse's United States customers would send their content to Soundmouse's

computers in the United Kingdom, and Soundmouse's computers would then compare the

customer's content to a musical "fingerprint database" also located in the United Kingdom.  *Id.*

at *2, 4.  Soundmouse's United Kingdom computers would then "send[] the results of the

comparison to the customers in those customer locations."  *Id.* at *4.  The district court found the

circumstances indistinguishable from *NTP*: users "transmit content to it from the United States

for processing and receive processed content back from Soundmouse in the United States."  *Id.*

at *5.  Like the users in *NTP*, Soundmouse's consumers were "in control of the system" because

the "system responds to and as a result of the user's conduct."  *See id.* at *5.

The same analysis applies here with the facts transposed.  Here, Foreign Users initiate the

Apple Pay card provisioning system by capturing their card information with a device in their

possession and thereby "caus[e] the system as a whole to perform."  *See Centillion*, 631 F.3d at

1285; *see also* Ex. 3, Shamos Depo. at 19:1-21:23.  Fintiv's expert, Dr. Shamos, concedes that

the <u>user</u> initiates the accused system:

PUBLIC VERSION



Ex. 3, Shamos Depo. at 19:1-5; *see also* Ex. 2, Shamos Report ¶ 119 (

).  Dr. Shamos also concedes the card provisioning

system would never be put into service but for the user's request to provision a card:

*Id*. at 19:6-22; *see also id*. at 28:12-21 (

).  And

Dr. Shamos concedes that Foreign Users receive the output of the card provisioning system on a

.  *See* Ex. 2, Shamos Report ¶ 119 ("

); Ex. 3, Shamos Depo. at 25:21-25, 26:22-25 (agreeing that "

);

*see also Centillion*, 631 F.3d at 1285.

Claim 18 confirms that Foreign Users "exercise control" over the card provisioning

system using devices in their possession outside the United States.  Claim 18 recites a "wallet

management system," wherein the wallet management system "is configured to receive the

mobile device information from a mobile device … ."  Ex. 1, '125 patent, claim 18.  In

comparing Apple's accused system to claim 18, Dr. Shamos contends that "

██████████████████████████████████████████

██████████████████████████████████████ Ex. 2, Shamos Report

¶ 533; *see also* ¶ 503.  Without a user's input of information from their mobile device, the

remaining claim limitations—"stor[ing] the mobile device information" and "register[ing] the

mobile device and the mobile wallet application"—would never happen.  *See Centillion*, 631

F.3d at 1285; *CLS Bank*, 667 F. Supp. 2d at 35-36.

In sum, there is no dispute that: (1) Foreign Users of the accused card provisioning

system control inputs to the system by capturing card information using Apple devices in their

possession; (2) Foreign Users' input triggers the rest of the accused system to work for its

intended purpose; (3) the accused system would never be put into service but for Foreign Users'

input; and (4) Foreign Users receive the output of the accused system on a one request/one

response basis.  As a matter of law, therefore, Foreign Users "exercise control" over the card

provisioning system from outside the United States.  *See NTP*, 418 F.3d at 1317; *Centillion*, 631

F.3d at 1285; *CLS Bank*, 667 F. Supp. 2d at 35-36; *Blue Spike,* 2014 WL 6851259, at *5.

### C.      For Foreign Users, Beneficial Use Of the System Is Obtained Outside The United States.

Under the second factor of the *NTP* analysis, "the place where … beneficial use of the

system obtained" for Foreign Users also is outside the United States.  For "beneficial use," courts

consider "the way in which the claimed [] system is actually used by [] customers."  *NTP*, 418

F.3d at 1317.  The alleged benefits must be "tangible, not speculative, and tethered to the

claims."  *Grecia v. McDonald's Corp*., 724 F. App'x 942, 947 (Fed. Cir. 2018).  And "beneficial

use" requires more than "general financial benefits and vague technological benefits."

*Acceleration Bay LLC v. Activision Blizzard, Inc*., 324 F. Supp. 3d 470, 483 (D. Del. 2018).

10

In *NTP*, the Federal Circuit held that RIM's customers in the United States obtained "beneficial use" of the accused email system because they "benefited from [the claimed] exchange of information":

> The user is no longer required to initiate a connection with the mail server to determine if he or she has new email … [and] "time spent dialing-up and connecting to the desktop (possibly to find that there is no new email) is eliminated as users … are notified virtually instantly of important messages, enabling the user to respond immediately."

*Id.* at 1290 (quoting asserted patent). Similarly, in *Renhcol Inc. v. Don Best Sports*, the accused product was an electronic marketplace for exchanging sports handicapping information. 548 F. Supp. 2d 356, 363-65 (E.D. Tex. 2008). The district court determined that "the handicappers and prediction consumers" in the United States, rather than the operator of the web server located in Canada, obtained beneficial use of the system because "the handicappers and prediction consumers benefit from the information exchanged in the marketplace":

> Both the handicappers and prediction consumers benefit from the execution of the alleged "code for receiving" and "code for calculating," as the prediction consumers ultimately receive the transmitted prediction information and the handicappers have their accounts credited if their event predictions are correct … . The handicappers and prediction consumers benefit from execution of the alleged "code for crediting," as the code's execution makes an electronic record to pay the handicappers and encourages the exchange of prediction information for the prediction consumers' benefit.

*Renhcol*, 548 F. Supp. 2d at 364-65.

The same analysis applies here, again with the facts transposed. Foreign Users of the Apple Pay card provisioning system obtain beneficial use of the system outside the United States because they "benefit[] from [the] exchange of information." *NTP*, 418 F.3d at 1289-90, 1317. According to Fintiv's expert, Dr. Shamos, the accused card provisioning system offers "numerous benefits," every one of which is obtained by the users, not by Apple. Ex. 3, Shamos

PUBLIC VERSION



Depo. at 29:16-30:10.  For example, Dr. Shamos concedes that " 

*Id*. at 29:10-14 (emphasis added).  Dr. Shamos opines that using the accused card provisioning system "

(Ex. 2, Shamos Report at ¶ 123)—again, a benefit to users, not to Apple.  Dr. Shamos further opines that:

*Id*. (emphasis added).  Thus, according to Fintiv's expert, the card provisioning system provides users the benefit of                                                              *Id.* All of these benefits are "tangible, not speculative, and tethered to the claims."  *Grecia*, 724 F. App'x at 947.  Thus, there can be no dispute that when Foreign Users use the accused card provisioning system, they obtain those benefits <u>outside</u> the United States.

In sum, Foreign Users of the Apple Pay card provisioning system exercise control over and obtain beneficial use of the system from outside the United States.  As a result, *NTP* compels a finding that Foreign Users do not use the accused card provisioning system "within the United States" under § 271(a).  Because no reasonable jury could find that Foreign Users infringe claim 18 of the '125 patent, the Court should enter partial summary judgment of noninfringement as to Foreign Users.

## V.     APPLE DOES NOT INFRINGE THE ASSERTED CLAIMS BECAUSE FINTIV HAS NO EVIDENCE OF A "WIDGET" IN THE ACCUSED PRODUCTS.

Apple is entitled to summary judgment of noninfringement as to all asserted claims because (1) Fintiv failed to identify any software code in the accused products that meets the

"widget" limitations of the asserted claims, and (2) undisputed facts confirm the accused

products do not use and are not configured to use a "widget."

Every asserted claim recites a "widget."  Claim 11 requires "retrieving a widget …

corresponding to a contactless card applet" and "provisioning the widget."  Claim 18 requires "a

widget management component configured to store and to manage widgets" and "a rule engine

configured to filter a widget."  Claim 23 requires "a mobile wallet application configured to store

a widget" and "an over-the-air (OTA) proxy configured to provision … a widget."  The Court

construed "widget" to have its plain and ordinary meaning; that is, "software that is either an

application or works with an application, and which may have a user interface."  Dkt. No. 86 at

17, 34.  The Court also ruled that "a POSITA would not understand that a widget is a stand-alone

application, but rather as code, *e.g.*, a 'plug-in,' that runs within an application."  Dkt. No. 86 at

16.  Thus, the Court's construction confirms the claimed "widget" must be software code that

"runs" within an application.  *Id.*

This is not the first time the Court has addressed the deficiencies in Fintiv's "widget"

infringement theories.  On October 16, 2020, Apple moved to strike Fintiv's infringement

contentions for failing to identify where the "widget" is found in the accused products.  *See* Dkt.

No. 186.  At the April 30, 2021 hearing on that motion, the Court denied Apple's motion to

strike "without prejudice to Apple raising that [the deficiencies in the infringement contentions]

in the context of what is now extant in the expert reports."  Ex. 11, 4/30/21 Hearing Tr. at 75:18-

21.  The Court explained:

> Now, to that extent, for better or worse, the plaintiff is limited by
> what is in the expert report.  And if you think that there is
> insufficient evidence in the expert report, then I would feel much
> more comfortable dealing with that on a motion for summary
> judgment basis or a Daubert basis, either one, than I am in trying to
> ferret out what was missing in the infringement contention.

13

PUBLIC VERSION

████████████

*Id*. at 75:8-15; *see also id*. at 77:1-10.  As demonstrated below, Fintiv's infringement expert report fails to identify any software code in the accused products that constitutes a "widget," and Fintiv's expert, Dr. Shamos, confirmed as much at his deposition.  Furthermore, the Apple engineers and experts uniformly confirm the accused products do not contain a "widget." Undisputed facts therefore demonstrate the accused products do not contain or use a "widget," and no reasonable jury could conclude the accused products meet the "widget" limitation of claims 11, 18, and 23.  Summary judgment of noninfringement is therefore warranted.

### A.     Fintiv And Its Expert Failed To Identify The Claimed "Widget" In The Accused Products.

Fintiv's expert Dr. Shamos failed to identify any Apple software code that constitutes a "widget" as construed by the Court.  Dr. Shamos recognized this failure at his deposition:



Ex. 3, Shamos Depo. at 73:12-74:5 (emphasis added).  In Dr. Shamos' expert report, only one paragraph discusses the "widget" limitation and contains citations to Apple's source code— paragraph 309.  Ex. 2, Shamos Report ¶ 309.  But when asked at his deposition, Dr. Shamos conceded that none of the source code cited in that paragraph is the claimed "widget":



Ex. 3, Shamos Depo. at 53:11-14.  When Dr. Shamos was asked about each of the source code

files cited in paragraph 309 individually, he confirmed that none of those files is a "widget."

 Dr. Shamos also confirmed that none of the

software files cited in other parts of his report constitutes a "widget":

*Id*. at 75:14-20 (emphasis added).  So contrary to Fintiv's representations at the April 30, 2021

hearing (*see* Ex. 11, 4/30/21 Hearing Tr. at 74:1-3), Dr. Shamos confirmed under oath that "there

is nowhere in [his] report that cites the source code that makes up the widget for any of the

accused devices."  Ex. 3, Shamos Depo. at 75:14-20.  Summary judgment is therefore warranted.

In addition to not identifying a "widget" in the accused products, Fintiv also failed to

present evidence that the accused products practice other "widget"-related limitations of the

asserted claims.  For starters, asserted claim 11 requires "retrieving a widget."  Dr. Shamos

agreed that during card provisioning a widget must be retrieved from an Apple server to an

accused device, but he could not identify any widget retrieved from any Apple server.  *Id*. at

56:23-25



. Asserted claim 18 requires "a widget management component configured to store and to manage widgets," but Dr. Shamos could not identify which server allegedly stores the claimed "widget," nor does he know which component is responsible for such storage:



*Id*. at 90:20-91:1.  Finally, asserted claim 23 requires "a mobile wallet application configured to store a widget," but Dr. Shamos does not know which application on the accused products stores the alleged "widget":



*Id*. at 89:16-24.  Thus, Fintiv has no evidence that a "widget" is retrieved from an Apple server; where or how a "widget" is stored on an Apple server; or what application on the accused products stores a "widget."

Fact and expert discovery are now closed.  Despite Fintiv having the relevant Apple Pay source code for months, neither Fintiv nor its expert have identified the software code that "runs within an application" in the accused products that purportedly meets the Court's construction of

16

PUBLIC VERSION

███████████████████

"widget."  It is now too late to do so in opposing summary judgment.  *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").  Summary judgment of noninfringement is therefore required.

**B.    Apple's Engineers And Experts Uniformly Confirmed That Apple Does Not Use The Claimed "Widget."**

Not surprisingly, Apple's engineers and experts uniformly confirm that Apple does not use a "widget."  During fact discovery, two engineers were asked questions about widgets, and they both testified that Apple does not use widgets in the accused products.  ███████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

███████████████████████████████

█████████████████

████████████████████████████████

███████████████

*Id*. at 68:2-11.  ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████   Ex. 6, Diederich Depo. at 18:4-7; 114:17-25.  ████████████████████

PUBLIC VERSION



Apple's technical expert, Henry Dreifus, also confirmed that "[n]one of the Accused Products or accused Apple Pay servers have the claimed 'widget,' and so none practice any of the asserted independent claims 11, 18, and 23."  Ex. 8, Dreifus Report at ¶¶ 165-204.  The reason Apple does not need or want to use "widgets" is simple—

*Id.* at ¶ 128.

*Id.* at ¶ 129.

*Id.*

Thus, the evidence is uniform that Apple does not use a "widget" in Apple Pay.  Because no reasonable jury could find that the accused products use the claimed "widget," summary judgment of noninfringement is warranted.

**C.    The Court Should Disregard The New "Widget" Theories Dr. Shamos Offered At His Deposition, But Those New Theories Do Not Change The Result Of This Motion.**

Having conceded his expert report does not identify any software code that qualifies as a "widget," Dr. Shamos tried at his deposition to introduce new "widget" theories that appear nowhere in Fintiv's infringement contentions or in Dr. Shamos' report.  The Court should disregard these untimely theories.  *See* Ex. 11, 4/30/21 Hearing Tr. at 76:10-77:9 (The Court: "Experts don't get to amend or supplement at depositions.  Now, they could certainly explain something that may or may not be clear, but they don't get to -- they don't get to say, oh, let me add to that … .  So they are limited within reason to the four corners of their expert reports.").

███████████████████

But even if the Court permitted Fintiv to adopt these newly asserted theories (which it should

not), the Court should nonetheless reject them as insufficient to preclude summary judgment.

    First, Dr. Shamos tried at his deposition to identify the "widget" as ██████████

███████████████████████████████████ Ex. 3, Shamos

Depo. at 78:1-10.  But, as Dr. Shamos admitted, █████████████████████ *Id*.

at 79:5-12.[2]  He also admitted he had no evidence to support his █████████████

███████████████████████████████

████████████████

███████████████████████████

█████

*Id*. at 79:13-19.  Dr. Shamos' new ████████ theory is therefore untimely and insufficient to

create a genuine issue for trial about whether Apple uses a "widget," as construed.

    Second, Dr. Shamos tried to excuse his failure to identify a "widget" in the accused

products by offering a new opinion that the widget might exist in "multiple components" and

might be part of the "user interface" for the Apple Wallet.  *Id*. at 64:16-65:1.  But he also

conceded that, even if the "widget" existed in multiple software components, he had not

identified any of those components:



---

WEST\294918330.1

PUBLIC VERSION



*Id*. at 64:7-15 (objection omitted).  And when pressed, Dr. Shamos admitted he could not

identify any software to support his new "interface" theory:

*Id*. at 66:1-11 (objections omitted; emphasis added).  Indeed, Dr. Shamos failed to analyze

whether the purported widget under his new "interface" theory would include operating system

code as opposed to application code, as the Court's construction requires.  *Id*. at 85:8-12

.  Thus, even if Dr. Shamos' new theories had been timely disclosed, they do not raise a

genuine issue of fact for trial about whether the accused products use a "widget" as construed by

the Court.  The Court should disregard these untimely and unsupported theories and enter

summary judgment in Apple's favor.

## VI.   THE ACCUSED IPADS AND MACS DO NOT MEET THE "CONTACTLESS" LIMITATION OF CLAIMS 11 AND 23.

The Court should rule that the accused iPads and Macs do not meet the Court's

construction of "contactless," as clarified at the August 28, 2020 claim construction hearing.  At

that hearing, the Court construed the term "contactless" to have its plain and ordinary meaning,

where "contactless" refers to "communication with a device where the communication does not

20

PUBLIC VERSION

██████████████████████

require physical contact." Ex. 10, 8/28/20 Hearing Tr. at 37:24-38:2.  But when Apple expressed

concern the construction would result in "a construction that simply means wireless," the Court

clarified:  "I don't think my construction of contactless does open it up to the unlimited field of

wireless.  I disagree with that.  I mean, I think one skilled in the art would not think that for this

invention."  *Id.* at 23:10-17.

Despite the Court's clarification, Fintiv and its expert, Dr. Shamos, are trying to equate

"contactless" with "wireless."  Dr. Shamos expressly opines: ████████████████████

████████████████████████████████████████████████████████

█████████████████████████ Ex. 2, Shamos Report at ¶ 88 (emphasis added).  At his

deposition, he doubled down on his "wireless" reconstruction of the term:

████████████████████████████████████████

██████

███████████████████████████████████████████

█

█████████████████████████████████████████

██████

Ex. 3, Shamos Depo. at 135:13-19, 136:19-22.

The Court should again confirm that its construction of "contactless" does not and cannot

encompass mere wireless communications over a network.  Doing so will result in summary

judgment of noninfringement with respect to the accused iPads and Macs, because it is

undisputed those products cannot perform "contactless" transactions as construed, but rather only

in-app or online transactions.

21

### A. The Court's Claim Construction Confirms That "Contactless" Does Not Mean "Wireless."

Claims 11 and 23 recite a "contactless card applet."  The Court's construction of that term is consistent with the use of "contactless" in the '125 patent.  As the Court ruled, "contactless" does not refer to merely wireless transactions, such as online transactions using a Wi-Fi connected device.  *See* Ex. 10, 8/28/20 Hearing Tr. at 23:10-17 ("So I don't -- I don't think my construction of contactless does open it up to the unlimited field of wireless.  I disagree with that.").  Indeed, the '125 patent uses parentheticals to equate "contactless payment" with "NFC-based applications."  Ex. 1, '125 patent at 1:47-51 (disclosing "a method of providing contactless payment (NFC-based applications) through provisioning account specific information within the secure domain of the mobile device's SE"); *see also id.* at 2:1-6; 2:8-10; 2:19-21; 7:20-26.  The patent explains that NFC technology is conventionally referred to as "contactless":

> Once the user financial credentials have been provisioned onto the NFC enabled mobile device, the provisioned NFC enabled device may transfer information or make payments to another NFC compatible device by coming near within a few centimeters of one another without physically contacting each other.  This type of technology is conventionally referred to as "contactless" technology and a payment made with this technology is referred to as "contactless" payment.

*Id.* at 1:55-62.  The specification does not disclose transactions conducted through "wireless" communication.  The patent therefore supports the Court's construction that a "contactless" card applet must allow consumers to conduct close-by transactions at a point of sale terminal rather than mere "wireless" transactions.  Ex. 10, 8/28/20 Hearing Tr. at 23:10-17.

### B. The Accused iPads And Macs Do Not Contain A "Contactless" Card Applet And Therefore Do Not Infringe Claims 11 And 23.

There is no dispute the accused iPads and Macs are incapable of performing NFC or other close-by transactions at a point of sale terminal.  Ex. 8, Dreifus Report at ¶¶ 249, 259-60

PUBLIC VERSION

██████████████████

(iPads and Macs do not contain NFC antennas); ██████████████████████

███████████████████████████ ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

The only way Fintiv can maintain its infringement claims against iPads and Macs is by contradicting the Court's construction of "contactless" and equating the term with the "wireless." As demonstrated above, this is precisely what Dr. Shamos tries to do when he claims that: "In a second type of contactless transaction, the buyer does not even have to be near the merchant at all, and a card transaction can be conducted over a network." Ex. 2, Shamos Report at ¶ 88.  To support this rejected construction, Dr. Shamos points to column 9, line 54 of the '125 patent, but that disclosure is inapposite.  There, the specification discloses an additional benefit that users obtain when they provision a card: "the user may view and manage the information stored in the WMA [wallet management application]." Ex. 1, '125 patent at 9:3-4.  The excerpt Dr. Shamos cites explains that "the user may also gain access to the account number, security code, and corresponding expiration date as necessary to make purchases online for further utility."  The next sentence discloses that the device may automatically "check the expiration date of the contactless card applet 23 and request update when the card applet expires." *Id.* at 9:52-60. These excerpts have nothing to do with "contactless" transactions.

In sum, no reasonable jury could conclude that the accused iPad and Mac devices use a "contactless" card applet as construed by the Court.  The Court should thus grant summary judgment of noninfringement as to Fintiv's claims against the accused iPads and Macs.

## VII.   THE ACCUSED IPHONE-WATCH PAIRING IS NOT A "MOBILE DEVICE" UNDER THE COURT'S CONSTRUCTION.

Contrary to the Court's express construction of the term "mobile device," Fintiv and its expert, Dr. Shamos, continue to maintain that an iPhone paired with an Apple Watch constitute a single "mobile device."  The Court's construction of "mobile device" expressly requires "a single mobile device."  Ex. 9, 10/21/20 Hearing Tr. at 41:23-42:3.  Despite this, Dr. Shamos' report flatly contradicts the Court's construction of "mobile device":



Ex. 2, Shamos Report ¶ 256 (emphasis added).  The Court should confirm that the combination of an iPhone and an Apple Watch are not a "single mobile device" under the Court's construction, because the undisputed facts show that an iPhone-Apple Watch pairing are in fact two mobile devices.  Ex. 3, Shamos Depo. at 148:13-16; Ex. 8, Dreifus Report ¶ 332-336.  As a result, no reasonable jury could find that the iPhone-Watch pairing infringes the asserted claims.

### A.   The Asserted Claims Require "A Single Mobile Device."

The asserted claims recite a "mobile device."  During claim construction, Apple argued that "mobile device" should be given its plain and ordinary meaning of "a single mobile device that may comprise multiple connected components."  Ex. 9, 10/21/20 Hearing Tr. at 39:13-40:13. The Court adopted Apple's construction that a "mobile device" means "a single mobile device." *Id*.  If that construction were not clear enough, the Court confirmed at an earlier hearing that "mobile device" cannot be construed to mean a network of multiple mobile devices:

> If your question or your concern is, can multiple mobile devices be combined, say, a phone and another -- a laptop, for lack of a better word, or something else, I agree with you, that is not -- <u>that is not</u>

████████████████████

> <u>what I intend to include</u>; and that's why the Court has said plain
> and ordinary meaning wherein the mobile device may comprise
> multiple connected components.

Ex. 10, 8/28/20 Hearing Tr. at 41:20-42:1 (emphasis added).

The Court's construction is consistent with the claims and the specification.  Each disclosure of a "mobile device" in the '125 patent refers to is a single, unitary device.  The specification does not disclose any examples of a "mobile device" consisting of multiple networked mobile devices.  Moreover, the claims recite that the "mobile device" contains "mobile device information," which "is information specific to smartphone hardware."  Ex. 1, '125 patent at 6:52-29.  All of this supports the Court's conclusion that the "mobile device" of the asserted claims is a "single mobile device."

### B.     The Pairing Of An iPhone And An Apple Watch Cannot Constitute "A Single Mobile Device."

There is no dispute the iPhone and Apple Watch are each a "mobile device."  Ex. 3, Shamos Depo. at 148:13-16; Ex. 8, Dreifus Report ¶ 332-336.  Each device has a separate secure element with a unique secure element ID ("SEID").  Ex. 2, Shamos Report ¶ 89.  And when a user provisions a card on an iPhone and an Apple Watch, each device creates a different device primary account number and different "token" that is unique to each device.  *Id.*; *see also* Ex. 8, Dreifus Report ¶ 334.  The pairing of an iPhone and an Apple Watch are therefore multiple mobile devices, meaning that the pairing is outside the scope of "mobile device," as construed.

Despite this, Fintiv continues to assert that the iPhone-Apple Watch pairing is a "single mobile device."  Faced with a claim construction to the contrary, Fintiv has no choice but to assert an illogical and circular infringement theory, arguing that every component of a mobile device is, in itself, a mobile device:

████████████████████

WEST\294918330.1

PUBLIC VERSION



Ex. 3, Shamos Depo. at 147:17-148:12 (emphasis added).  This passage highlights just how far

Dr. Shamos has strayed from the Court's construction of "mobile device" and from the teachings

of the '125 patent.

In sum, no reasonable jury could conclude that two "mobile devices," an iPhone and an

Apple Watch, can be paired to create a "single mobile device" as required by the Court's

construction.  The Court should grant summary judgment of noninfringement as to Fintiv's

allegations that an iPhone-Apple Watch pairing infringes the asserted claims.

## VIII.  CONCLUSION

For the foregoing reasons, summary judgment of noninfringement is warranted on four

independent grounds: (1) Foreign Users do not infringe asserted independent claim 18 (and its

dependent claims 13 and 14) when they provision cards on foreign devices outside the United

States; (2) Apple does not infringe any asserted claim because Fintiv failed to identify anything

in the accused products that constitutes a "widget"; (3) the accused iPads and Macs do not

infringe asserted independent claims 11 and 23 (and their dependent claims 13, 14, 24 and 25)

because they do not and cannot perform "contactless" transactions; and (4) the pairing of an

iPhone and Apple Watch does not infringe the asserted claims because they do not meet the

"mobile device" limitation of the asserted claims.

WEST\294918330.1

Dated: June 28, 2021

Respectfully submitted,


*/s/ John M. Guaragna*
John M. Guaragna
Texas Bar No. 24043308
Zachary Loney *(Pro Hac Vice)*
Texas Bar No. 24092714
**DLA PIPER LLP (US)**
303 Colorado, Suite 3000
Austin, TX 78701
Telephone: (512) 457-7000
Facsimile: (512) 457-7001
john.guaragna@us.dlapiper.com

Mark D. Fowler *(Pro Hac Vice)*
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, California 94303-2214
Telephone: (650) 833-2000
Facsimile: (650) 833-2001

Sean C. Cunningham (*Pro Hac Vice*)
CA Bar No. 98895
Erin Gibson (*Pro Hac Vice*)
CA Bar No. 229305
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: 619.699.2700
Fax: 619.699.2701
sean.cunningham@dlapiper.com
erin.gibson@dlapiper.com

Paul Steadman (*Pro Hac Vice*)
Stephanie Lim (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
444 West Lake Street, Ste. 900
Chicago, IL 60606
Telephone: 312.368.4000

J. Stephen Ravel
State Bar No. 16584975
**KELLY HART & HALLMAN LLP**
303 Colorado, Suite 2000
Austin, TX 78701

27

PUBLIC VERSION

Telephone:  512.495.6329
Facsimile:  512.495.6401
steve.ravel@kellyhart.com

*Attorneys for Defendant Apple Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 28th day of June 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail.

*/s/  John M. Guaragna*
John M. Guaragna